MEMORANDUM OF DECISION
This memorandum of decision terminates the parental rights of Jose R.'s biological parents, Arelis E. and Juan R. On June 30, 1999, DCF filed the present petition to terminate their parental rights alleging that:
 • Jose's mother, the respondent Arelis E., had failed to rehabilitate herself so that she could assume a responsible position in Jose's life;
 • Jose's father, the respondent Juan R., had abandoned his son and had no ongoing parent-child relationship with the child; and
 • It is in the best interest of the minor child, Jose R., to terminate the parental rights of the respondents.
For the reasons stated below, the court finds that the petitioner has proven the allegations of the petition as to both parents by clear and convincing evidence and accordingly grants the petition.
 I — INTRODUCTION
In deciding the TPR petition, the court will consider evidence offered (a) at a hearing on November 3, 2000, on whether to prohibit supervised visitations between the respondent father and minor child, and (b) during CT Page 2312 five days of trial in February, March, and November 2001. The parties made their closing arguments on December 12, 2001. All transcripts ordered by the court and briefs of the parties had been filed by January 4, 2002, and the case was then submitted to the court for decision.
At the pretrial hearing, the petitioner offered testimony from Dr. Eneida Silva, Ph.D., a clinical psychologist who conducted court-ordered psychological examinations of the respondent father and minor child. At trial, the petitioner called the following as witnesses:
 • Loida Reyes, the DCF supervisor on this case from September 1998 until April 1999;
• Zaira Reyes, the DCF worker assigned to this case;
 • Christopher Lewis, a program manager at Barnard House at the Institute of Living in Hartford;
• Amaury V., the child's foster father; and
 • Ada Rodriguez, a licensed professional counselor employed at Wheeler Clinic as a specialized foster care worker and therapist, who testified at trial as an expert in child therapy.
The respondent mother called as a witness at trial Ellen Crowley, an advanced practice registered nurse who is a treatment care manager at the Institute of Living and testified as an expert in adult mental health care.
The respondent father called the following witnesses at trial:
 • Nayda Roper, the Latino program manager at the Alcohol and Drug Recovery Center (ADRC);
 • Lesbia Nieves, a DCF social worker assigned to this case from September 1997 until October 1998; and
• Luz E., the child's maternal grandmother.
The attorney for the minor child (AMC) offered testimony from the child's court appointed guardian ad [item (GAL), Attorney Marcia McCormick, at both the visitation hearing and trial. At the pretrial hearing, the AMC also offered testimony from Ada Rodriguez, who testified there as an expert in counseling.
The parties also introduced into evidence various exhibits at the CT Page 2313 pretrial hearing and trial.
The court finds that the Child Protection Session of the Superior Court for Juvenile Matters has jurisdiction over the pending matter. The court finds that proper service has been made on all parties. No action is pending in any other court affecting custody of these children. Both respondents were represented by counsel and appeared personally for trial. The petitioner and the minor children were represented by their respective counsel throughout the proceeding.
The court has carefully considered the verified petition, all of the evidence, including the social study and other exhibits, and the testimony presented, according to the standards required by law.[2]
Upon such consideration, the court finds that the facts recited in this decision were proven by clear and convincing evidence at trial.
 II — FINDINGS OF FACT[3] A. The respondent mother, Arelis E.
1. Events occurring before commitment of the child
Arelis E., the mother alleged here to be incapable of caring adequately for her child, was herself an abused and neglected child with special needs. Her mother's household, where she grew up, was an "extremely dysfunctional" family (Resp. mother's ex. G) that was the subject of 22 DCF interventions, 18 of which were substantiated as abuse or neglect. As a young child, Arelis was sexually abused by an uncle. She received little nurturing from her mother, with whom she has had a turbulent and violent relationship that has steadily worsened over the years. Early in life Arelis began displaying symptoms of severe mental disorder and was first hospitalized at the age of five with a diagnosis of bipolar disease (Resp. mother's. ex. G), which continues to afflict her to this day. She is "extremely emotionally labile and when upset becomes suicidal and aggressive." (Id.) Although in therapy since a child and prescribed psychotropic medication to control the symptoms of her mental illness, she has been hospitalized many times because of psychiatric problems and not taking prescribed psychotropic medication. (Pet. ex. 1 at 3.)
In 1995, when only fifteen years old, Arelis became pregnant with Jose after having sexual relations with Juan R., who was twice her age and also living in her mother's household. Arelis and Mr. R. had a volatile relationship that included frequent arguments and physical violence. Shortly after impregnating Arelis, Mr. R. returned to his place of origin in Puerto Rico. While Arelis was pregnant, she was again hospitalized for psychiatric problems, in November 1995, after having suicidal and CT Page 2314 homicidal ideations.
When Jose was born on April 18, 1996, Arelis was by then sixteen years old. DCF offered her therapy for her mental health problems and counseling with her mother and siblings to help address their chaotic home life. In September, at Mr. R.'s request, Arelis moved with the baby to Cawas, Puerto Rico, to live with him in his mother's house. (Pet. ex. 1.) Arelis was soon unhappy there, however, and, after only a month, she called her Connecticut DCF worker to complain about her relationship with the paternal grandmother. Within another month, Arelis had a psychiatric episode that resulted in her being hospitalized there. The Commonwealth of Puerto Rico found her to be incompetent (Pet. ex. 1 at 2) and took Jose into custody until February 1997, when it awarded custody and guardianship to Arelis's mother, who brought Arelis and the baby back to Connecticut to live in her household.
Arelis and Jose stayed with the maternal grandmother for the next year. A convicted sex offender was also living in the same household. DCF again offered counseling and family therapy to Arelis, but her mental health deteriorated. On February 10, 1998, Arelis dragged Jose downstairs, threw him on a couch, began choking her younger sister until the maternal grandmother intervened, then got a knife and threatened to kill herself, the family, and her child. After Arelis went upstairs and began hitting herself, the family called 911. (Pet. ex. 14.) As a result, Arelis was hospitalized at the Institute of Living (IOL).
After this incident, DCF social workers interviewed Arelis's mother and siblings, who told them that the family referred to Arelis as "La Loca" ("the crazy one") and that such incidents were not unusual. Id. Although a DCF social worker who visited the house did not find any injuries on the child, and Jose was clean and appropriately clothed, DCF decided to seek an order of temporary custody (OTC). Id. Taking judicial notice of the contents of its own files, the court notes that a DCF social worker affidavit attached to an OTC motion and petition for neglect filed on February 11, 1998, alleged that, in addition to Arelis's behavior of the day before, the presence of the convicted sex offender in Luz's household posed a risk to Jose's safety and well-being. The court that day issued an ex parte OTC for DCF to take Arelis, her siblings, and Jose all into state custody. The court also ordered specific steps for Arelis to take to facilitate reunification with her child.[4] On February 20, 1998, the court, McWeeney, J., sustained the OTC. On June 4, 1998, the court,McLachlan, J., adjudicated Jose to be a neglected child, committed him to DCF for one year, and again entered orders as to the conduct expected of Arelis. The court's expectations in large part mirrored the February court-ordered steps.[5]
CT Page 2315
After Arelis's discharge from the IOL on February 13, DCF intended to take her to the Connecticut Children's Place (CCP), a DCF diagnostic facility, to identify the most appropriate placement and treatment for her. When a DCF social worker took her home to pick up her personal effects on the way to CCP, Arelis got into another violent confrontation with her mother and was again hospitalized, this time at the Connecticut Children's Medical Center. (Test. L. Reyes, 2/20/01 at 36.) Once stabilized there, she then went to the Children's Place, where she stayed for four months. At CCP, DCF provided her weekly visits with Jose, individual and family counseling, parenting classes, and medication management. While there, Arelis continued to have volatile outbursts and on one occasion had to be physically restrained an(1 then placed on a suicide watch. (Id. at 42, 65.)
2. Events after commitment of the child
After taking Jose into foster care, DCF believed that Arelis needed to address her mental health issues and begin living independently before she could assume care for Jose. (Id. at 64-66.) Because of the longstanding conflict between Arelis and her mother, and the fact that a convicted sex offender was living with her mother, DCF correctly believed that it was not in Jose's best interest for Arelis to raise her child in her mother's household. In June 1998 Arelis accepted a DCF voluntary placement at Barnard House, a DCF independent living facility affiliated with the Institute of Living. Barnard House is a residential "placement for youth who are going to be transitioned into independent living — to living on their own." (Id. at 43.) It is a "supervised apartment program that . . . provide[s] assistance to adolescents in their late teen years who are transitioning into adulthood . . . but have demonstrated they need additional support as they age into their early adult years." (Testimony of Christopher Lewis, 2/20/01 at 88-89.)
Barnard House gave Arelis training in various life skills, such as cooking, shopping, budgeting, and money management, that she would need to live independently. She also received job training; education and tutoring through the Hartford Board of Education; advice and guidance from the program staff, referral to an eight-session program at the Hispanic Health Council to help her learn parenting skills; and, for her mental health problems, weekly therapy and medication management with Dr. Kriback at the Charter Oak Mental Health Clinic, whom Arelis had been seeing since before 1996.
During eleven months at Barnard House, Arelis continued to exhibit aggressive and disturbed behavior within the program, at school, and while visiting home. She sometimes refused to attend her therapy sessions or take her medication. When she got upset, she would become violent, CT Page 2316 physically aggressive, and threaten to harm herself or others. On January 25, 1999, for example, after an argument at home with her brother, she put a knife to his throat and threatened to kill her entire family. Upon her return to Barnard House, she repeated that threat, "stating that she wanted revenge on her family [and] was going to kill them." In mid-March she threatened to kill the DCF social worker if DCF did not return her child: "[s]he further stated that she knew what kind of car [the DCF] worker [drove] and that she would blow it up and then herself at the program." On several occasions she assaulted other students in the Barnard House program or at school; in January and March fights with other students, it took four teachers to overcome and restrain her. She was taken at least three times to the emergency room because her threatening or violent behavior got out of control. On several occasions she threatened to injure or kill her son, and repeatedly told the DCF worker and others that she no longer wanted custody of her son. (Pet. ex. 1 at 4-5; Pet. ex. 8; testimony of Z. Reyes and C. Lewis.)
On May 3, 1999, Arelis was discharged from Barnard House because of her repeated outbursts and noncompliance with program rules (Test. C. Lewis, 2/20/01 at 100; Pet. ex. 1 at 4) and moved back into her mother's home. After leaving Barnard House, Arelis stopped taking her psychotropic medication or visiting her therapist. On August 6, 2000, she was again hospitalized because of a psychiatric crisis. She told emergency room personnel that for the last week she had been having auditory hallucinations urging her to hurt herself and that she did not want to live any longer. A day later, still saying she wanted to kill herself, she was transferred to the Institute of Living, where
 [s]he said she felt that no one loved her and that her family "placed me here to get rid of me." She feels everyone hates her. She stated that everyone thinks she is "stupid" and treats her like "garbage." . . . She feels hopeless, is anhedonic, and believes that people do not like her and talk and laugh about her. . . . [S]he was extremely agitated and paranoid.
(Resp. mother's ex. F.)
After three days at the IOL, Arelis's mood had stabilized and she was transferred to the IOL's Adult Day Treatment Program as a transition back to living in the community. In this partial hospitalization program, she received regular therapy, saw a psychiatrist for medication management, and attended various group therapy sessions. The goal of her stay there
was for her to be made compliant [with her medications on an ongoing basis]. She had . . . a history of CT Page 2317 non-compliance. And people with mental illness need to be persuaded to remain on their medication.
(Testimony of E. Crawley, 2/22/901 at 116.) She remained there until the following January, when she was discharged as moderately improved. By then she had been on psychotropic medication for several months and was no longer having auditory hallucinations.
Arelis's clinician in the day treatment program, Ellen Crowley, appearing as an expert in adult mental health care at trial, testified that although it is "difficult to come to the realization that you need to take medication every day," particularly when the medications cause side effects, as those prescribed for Arelis do, "I believe Arelis has come to terms with" her mental illness. Crowley characterized Arelis as "generally compliant" with her medication regime while in the program, although Arelis did not take her psychotropic medication in two weeks that fall when she did not refill the prescription in a timely manner. Arelis also missed numerous scheduled appointments but did keep in regular contact with her clinician, which Crawley testified "was essentially what she needed to do. . . . If she could not come into the program, she would make sure she contacted me. . . ." (Testimony of E. Crowley, 2/22/01 at 107-108.) One of the aggravating factors precipitating Arelis's psychiatric episodes has historically been her tumultuous relationship with her mother. Crowley testified that Arelis needs an environment and interpersonal relationships that are supportive. In September 2000, Arelis moved out of her mother's home and into her own apartment. In December 2000, she moved into an apartment with a new boyfriend, Samuel R., whom Crawley perceived as supportive of Arelis and her mental health needs.
The evidence did not disclose any more recent hospitalizations for Arelis. But other evidence shows continuing problems on her part. On one day of this trial, when she had stopped taking her medication because she was pregnant, the court observed her repeatedly exhibiting unusual and bizarre behavior in the courtroom, shaking her head, fidgeting, and acting agitated. She did not attend two days of trial despite sufficient notice and offers from DCF to provide child care and transportation to court. In April 2001, a DCF worker observed bruises on her right eyelid and scratches on her arms; when asked about those injuries, Arelis became angry, told the worker that everything was okay, and said that she did not have any problems. She missed four of five visits with Jose in May, two of four visits in June, and three of five visits in July. In August she told DCF that she no longer wanted to visit her son, wanted to terminate her parental rights, and was struggling with her own life. In October, after her new baby was born, she told her DCF worker that although earlier she had been having conflict and not talking with her CT Page 2318 boyfriend, "they were in a good relationship again." (Testi. Z. Reyes.) She also stated she now wanted to retain her parental rights to Jose.
B. The respondent father, Juan R.
After Jose returned to Connecticut with his mother and maternal grandmother, the respondent father remained in Puerto Rico. While there, Mr. R. periodically called the maternal grandmother to ask about Jose. Once, he also sent her a check for one hundred dollars to help pay for Jose's expenses. Before taking Jose into custody, a DCF social worker asked the respondent mother and maternal grandmother if they knew the whereabouts of Mr. R., and both told the worker that he lived somewhere in Puerto Rico but they did not know where. A DCF social worker told the maternal grandmother that if Mr. R. returned to the continental United States, he might be arrested for having had sexual intercourse with Arelis when he was an adult and she was a minor under the age of consent. In one of Mr. R.'s telephone calls to her, the maternal grandmother told him that DCF had taken custody of his son. She told him the name of the DCF social worker assigned to Jose's case. She also reported to him the DCF worker's statement that he might be arrested. Mr. R. continued to call the maternal grandmother to ask about Jose. Between the OTC and filing of the TPR petition, however, he never called, wrote, or in any way contacted DCF to express interest in his son, never contributed to Jose's financial support, and never sent any cards, letters, or gifts for Jose.
After Jose went into state custody, Mr. R's sister, who lives in Manchester, Connecticut, contacted DCF to inquire about serving as a placement for Jose. In February 1998 a DCF social worker spoke with the sister but did not ask if the sister knew of Mr. R's whereabouts; and the sister did not then volunteer that information. Later, in June 1999, when DCF was preparing to file the TPR petition, a DCF social worker again spoke with the sister and this time asked if she knew where Mr. R. was. The sister gave DCF a specific address in Puerto Rico, at which DCF, with court approval, served the TPR petition, in the English language, by certified mail. Mr. R. received service of the TPR petition, and appeared before the Superior Court for juvenile matters in Hartford on the plea date set forth in the petition.
Since appearing in this matter, Mr. R. has maintained regular contact with DCF. He has regularly provided gifts, cards and letters for Jose. He has attended all court and DCF administrative proceedings concerning his son. He has also paid child support to the State of Connecticut. (Although there is evidence that he owes an arrearage on the child support payments, without any evidence as to how or when that arrearage arose, whether from before or since his return to Connecticut, the court CT Page 2319 makes no inferences that he has not been regular in paying child support since he began to do so.) He has regularly requested contact and visitation with his son.
DCF has referred Mr. R. to substance abuse evaluation and treatment, which he successfully completed. Regular random drug screens show that he has not used any illegal narcotic substances. After initial resistance, he took and completed anger management classes to which DCF had referred him and, at the time of trial, was participating in domestic violence treatment classes to which DCF referred him. He has not participated in parenting classes recommended by DCF, however. Since his return to the United States, he has had regular employment. After initially living with his sister in Manchester, he moved to an apartment of his own but, as of the time of trial, had not given his new address to DCF.
C. The child, Jose R.
Since April 1999 (when he was three years old) Jose has been living in a single-parent foster home with his foster father, Amaury V. Mr. V. provides a nurturing, loving, stable and structured environment for him. The foster placement has gone very smoothly in the home. In day care while Mr. V. is at work, however, Jose was agitated and aggressive with the other children, did not follow adult directions or know how to share toys, and had temper tantrums. When Jose's behavior at the daycare did not improve, the foster father sought therapy for Jose at the end of 1999. DCF referred him to Wheeler Guidance Clinic, where Ada Rodriguez began meeting with him in weekly therapy sessions in February 2000. She also met frequently with Mr. V. By May, Jose's behavior at daycare had improved dramatically and the therapy was discontinued.
In July 2000, after Jose entered a school readiness program to prepare him for entering school in the fall, his behavior at daycare deteriorated to the previous levels. Weekly therapy resumed with Ada Rodriguez in August. When school started, he continued to have temper tantrums and act very aggressively in school and day care. After a psychiatric evaluation at the end of the year, Jose was diagnosed with attention deficit hyperactivity disorder and placed on Adderall to control his aggression and impulsivity. In February 2001 Ms. Rodriguez increased the therapy sessions to twice-weekly. By November 2001, at the close of evidence, Jose's behavior in school had improved considerably. Mr. V. was no longer receiving calls from the school about the child's behavior, and Jose's behavior in kindergarten was, in the words of the guardian ad litem "commendable."
Jose is very bonded to his foster father, around whom Jose's entire world revolves. Jose wants to live with his foster father. He rarely CT Page 2320 talks about his mother; but if asked about seeing her, he will say that his visit went well and he was sad to leave her. He has no memory or positive feelings for the respondent father as father, and has seen Mr. R. only once, during a court-ordered psychological evaluation, since coming back from Puerto Rico when he was four months old.
Jose has been diagnosed clinically with both attention deficit hyperactivity disorder and post-traumatic stress disorder. He is an active, energetic child who is constantly on the go. He reacts to confusion or difficulty by becoming threatening and aggressive. He needs a home environment that will provide him with structure, stability and consistency. He needs to know that he can trust the adults around him to take care of him, contain his behavior, and set clear limits and consequences for him.
 III — ADJUDICATORY DECISION
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. The burden of proof in both phases is clear and convincing evidence. In the adjudicatory phase of the proceeding, the court must make separate determinations as to reasonable efforts and statutory grounds for termination. "In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In reTabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); Practice Book § 33-3(a).
A. Reasonable Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it
 has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate. . . .
General Statutes § 17a-112 (j)(1). DCF may satisfy its obligations under this subsection in one of three ways — (1) proving by clear and convincing evidence in the TPR trial that it made reasonable efforts to locate the parent and reunify parent and child; (2) proving by clear and convincing evidence in the TPR trial that the parent was unwilling or CT Page 2321 unable to benefit from reunification efforts; or (3) establishing to the satisfaction of the juvenile court at a pretrial hearing pursuant §17a-110 (b) or § 17a-111b that such efforts are not appropriate.
The reasonable efforts determination is part of the adjudicatory decision. In Re Tabitha T., 51 Conn. App. 595, 599, 722 A.2d 1232 (1999) ("As part of the adjudication process, § 17a-112 (c)(1) requires that the court find by clear and convincing evidence that `the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts. . . .'") This court is therefore limited, in assessing the reasonableness of location and reunification efforts, to considering facts occurring before filing of the TPR petition.
1. The respondent mother
DCF alleges in the petition both that it made reasonable efforts to reunify Arelis with her child and that she was unwilling or unable to benefit from such reunification efforts. Since the purpose of reunification services is to assist the parent in becoming a fit custodian of her child, the court must assess the reasonableness of the services provided by DCF in light of the patent's problems that led to the child's removal. In the present case, the principal problems affecting Arelis's suitability as a parent were her mental illness and its manifestations in her conduct, her volatile relationship with her mother, and her residing in her mother's household where a known sex offender also lived. To help her address these problems, DCF provided residential services at Barnard House to help Arelis gain the ability to live independently. DCF offered her mental health treatment services. It referred her to parenting classes to help her learn appropriate ways of parenting her child. DCF also provided regular visits with her child. Unfortunately, Arelis's conduct at Barnard House showed that she was not then willing or able to benefit from these services. Nonetheless, the various services provided by DCF were appropriate for the problems besetting Arelis, and the court thus finds by clear and convincing evidence that DCF made reasonable efforts to reunify her with her child and that she was unwilling or unable to benefit from reunification services.
2. The respondent father
DCF has alleged both that it made reasonable efforts to locate Mr. R. and that he was unwilling or unable to benefit from reunification efforts. Proving the latter obviates the need to allege or prove the former, for § 17a-112 (j)(1) does not require a finding of CT Page 2322 reasonable efforts, either to locate or reunify, if the court finds "that the parent is unable or unwilling to benefit from reunification efforts."[6]
The evidence shows that after Jose was taken into DCF custody, Mr. R. was living in Puerto Rico. The maternal grandmother told him that Jose was in DCF custody and the name of the DCF social worker. The maternal grandmother also reported to him that the DCF social worker had told her he might be arrested if he returned to Connecticut. Arelis had conceived Jose when she was fifteen years old and Mr. R. was almost twice her age. An arrest was certainly feasible since, by having such sexual relations with Arelis when she was under the statutory age of consent, Mr. R. had violated Connecticut criminal laws prohibiting risk of injury to minors; General Statutes § 53-21; and sexual intercourse with a minor; General Statutes § 53a-71 (a). He was, moreover, already facing pending charges for risk of injury and other offenses. See Pet. ex. 4. Despite regular contact with the maternal grandmother, he made no effort to contact DCF after DCF took Jose into custody. Under these circumstances, the court finds by clear and convincing evidence that Mr. R. was unwilling or unable, in the time preceding the filing of the TPR petition, to benefit from reunification efforts. With him in Puerto Rico and not making any contact with DCF, DCF could not have done anything to offer him any reunification services.
B. Statutory Grounds for Termination
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112 (j)(3).
1. The respondent mother — Failure to Rehabilitate, § 17a-112 (j)(3)(B)
As grounds for terminating Arelis's parental rights, DCF alleges that she has failed to rehabilitate herself pursuant to § 17a-112 (c)(3) (B), now § 17a-112 (j)(3)(B). That subsection of the TPR statute, as of the date of this decision, provides in relevant part as follows:
The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . that . . . the child . . . has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided CT Page 2323 specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . .[7]
In conducting the inquiry whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider:
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child.
"The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that which would encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time." In re Shyliesh H,56 Conn. App. 167, 173, 743 A.2d 165 (1999). "Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting." (Id.)
The crux of the adjudicatory ground of failure to rehabilitate is whether a parent has sufficiently addressed the deficiencies in parenting that led to state intervention in the family so that the parent can, considering the age and needs of the child, assume a responsible position in the child's life, or will be able to do so within a reasonable time. As the Appellate Court noted in In re Sarah Ann K., 57 Conn. App. 441,448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." From the "historical perspective" in this case, the evidence and record establish that three problems stood in Arelis's way of being a fit parent: her mental illness of bipolar disease, her troubled and volatile relationship with her mother, and living in her mother's household where a convicted sex offender resided and child abuse had been rampant over the years. As noted above in the section on reunification efforts, DCF offered appropriate services to help this young woman address these problems. Yet as of June 30, 1999, the date when DCF filed the TPR petition, Arelis had only a month earlier left Barnard House and returned to living with her mother. In the immediately preceding months, she had been off and on her medication and missed therapy appointments Her volatile and uncontrolled CT Page 2324 behavior in the summer, fall, and early winter of 1999, the resulting repeated trips to the emergency room in that period, her repeated failure to stay on her medication or attend psychotherapy during that period all show that, as of the adjudicatory date, she had failed to rehabilitate herself sufficiently to care for any child.
Section 17a-112 "requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child. . . ." (Internal quotation marks omitted.) In re Eden F., supra,250 Conn. 706. As noted above, Jose is an active, energetic child who reacts to confusion or difficulty by becoming threatening and aggressive. He needs a home environment that will provide him with stability and consistency. He needs to know that he can trust the adults around him to take care of him, contain his behavior, and set clear limits and consequences for him. The chaotic home environment at the maternal grandmother's residence, Arelis's psychiatric instability, and her emotional and behavioral outbursts are the very opposite of what Jose needs. The court thus finds, by clear and convincing evidence, that as of the adjudicatory date, the respondent mother had not sufficiently rehabilitated herself that she could then, considering Jose's age and needs, assume a responsible position in his life.
The failure-to-rehabilitate statute further requires the court to consider not only whether a respondent had rehabilitated herself as of the adjudicatory date, but to determine whether the prospects for rehabilitation can be realized within a reasonable time. As of the adjudicatory date, clear and convincing evidence establishes that there was no reasonable prospect that Arelis would, within a reasonable time thereafter, attain the required level of rehabilitation. As of that point, there was no evidence of any willingness or inclination on her part to change the status quo.
In the adjudicatory phase of a TPR trial, the court may ordinarily consider only evidence arising before the adjudicatory date. In assessing whether a TPR respondent is likely, within a reasonably foreseeable time, to achieve the level of personal rehabilitation necessary to parent her child, however, the court may also consider post-adjudicatory-date evidence. "It is axiomatic that the court can rely on factors occurring after the date of the filing of the petition to terminate parental rights when considering if additional time would promote rehabilitation. In reSarah M., 19 Conn. App. 371, 377, 562 A.2d 566 (1989)." In re Amber B.,56 Conn. App. 776, 785, 746 A.2d 222 (2000).
Despite Practice Book § 33-3(a) and case law regarding termination proceedings generally, we have determined that with regard to termination petitions CT Page 2325 brought under § 17a-112 (c)(3)(B), the trial court may, in the adjudicatory phase, properly consider facts and events that occur after the filing date of the petition in determining whether a respondent has achieved a sufficient degree of personal rehabilitation within the meaning of that statute. In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time."
(Citation omitted; emphasis in original.) In re Latifa K.,67 Conn. App. 742, 748-749, ___ A.2d ___ (2002).
In the months after the adjudicatory date and through the close of evidence, Arelis took steps to address her bipolar mental disease. After a psychiatric hospitalization in August 2000, she participated in the Institute of Living Adult Day Treatment Program for several months. Although she missed some of her therapy appointments, and was occasionally lax in medication compliance, by the time of her discharge she was moderately improved and had finally accepted the fact that she has bipolar disease. She left her mother's home and moved in with a supportive and nurturing boyfriend. The evidence at trial shows that except for times when she has been pregnant she has since then remained on her medications and there have been no subsequent psychiatric hospitalizations.
Yet even with this improvement, the evidence does not offer any firm indication whether Arelis will be ever able to meet Jose's needs. She missed many visits with the child during the spring and summer of 2001. Though her parental rights were in jeopardy, she missed several court sessions despite adequate notice. She has wavered on whether she wants to maintain her parental rights. Her conduct during one day of trial was bizarre and unusual. Her attorney argued in summation that the court should disregard Arelis's conduct during 2001 while she was off her medication because pregnant. Yet the totality of the evidence about Arelis, including her numerous psychiatric episodes and her overall behavior, is the most important information the court has for assessing her present and future rehabilitative status. Evidence of her recent behavior is the most credible evidence the court has as to her likely future behavior and whether or when she will be able to meet Jose's needs. This child needs stability, predictability, and constancy, and the evidence does not offer any basis for determining when his mother could CT Page 2326 offer him these qualities. Considering this child, and his age and needs, the court finds by clear and convincing evidence that, as of the adjudicatory date of June 30, 1999, the respondent mother had not rehabilitated herself to the extent that she could then, or within a reasonable time, assume a responsible position in his life.
2. The respondent father
The petitioner has asserted abandonment and no ongoing parent-child relationship with the minor child as grounds for terminating the parental rights of Mr. R. The court will consider each in turn.
 (a) Abandonment — § 17a-112 (j)(3)(A)
Section 17a-112 (j) of the General Statutes provides that "[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . .".
Abandonment "focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [Rev, to 1995] § 17a-112 (b)(1) [now § 17a-112
(j)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . ." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993). The statute requires DCF to show by clear and convincing evidence that a parent has failed to maintain a reasonable degree of interest in the welfare of his or her child.
Maintain implies a continuing, reasonable degree of concern not a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical CT Page 2327 care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . .
(Internal quotation marks omitted.) (Id.)
Applying these criteria to the present case, the court finds by clear and convincing evidence that as of the adjudicatory date, the respondent father had abandoned Jose. Knowing for eighteen months that Jose was in DCF care, Mr. R. made no efforts to have contact with the child. As Jose's parent, he was a natural placement for the child upon its removal from the care of Arelis and her mother. Mr. R. even had a right to custody of the child unless DCF could establish a basis for an OTC as to him. Yet he neglected any effort to seek custody of his son. His phone calls to the maternal grandmother in foster care do not show a reasonable or responsible degree of interest, concern or responsibility as to the welfare of his child. He provided no support for the child during this time and showed none of the other attributes of parenthood. This evidence clearly and convincingly establishes that as of the adjudicatory date Mr. R. had abandoned his child.
 (b) No Ongoing Parent-Child Relationship — § 17a-112 (j)(3)(D)
DCF also alleges no ongoing parent-child relationship between the respondent father and his son. This allegation invokes General Statutes § 17a-112 (j)(3)(D), which establishes a basis for terminating parental rights when
 there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . .
Under this section, the court must "undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In Re John G., 53 Conn. App. 12,22, 740 A.2d 496 (1999). "To satisfy the second prong [of the analysis], the trial court [is] required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship. . . . The `best interest' standard, therefore, CT Page 2328 does not become relevant until after it has been determined that no ongoing parent-child relationship exists." (Citation omitted.)In re KeziaM., 33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915,636 A.2d 847 (1993). The factors to be considered in deciding whether it would be in the best interest of a child to permit further time for a relationship with his parent to develop include "(1) the length of stay with the foster parents, (2) the nature of the child's relationship with the foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of the child's relationship to his or her natural parent." (Id.)
There is no doubt whatsoever, and the court finds by clear and convincing evidence, that as of the adjudicatory date Mr. R. did not have an ongoing parent-child relationship with Jose. He had not seen or had contact the child for almost eighteen months, nor shown any of the other indicia of a parental relationship with the child. The only feelings the child has for his father, moreover, are negative ones: in March 2001 Jose asked his foster father to remove a photograph of Mr. R. from a notebook where Jose has kept momentos of his biological family because "his father had done something bad to his mother." (Testi. M. McCormick, 11/15/01.) "In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.) In re John G., 56 Conn. App. 12,23, 740 A.2d 496 (1999). "Feelings for the natural parent connotes feelings of a positive nature only. . . . An ongoing parent-child relationship is one that develops as a result of a parent having met on a continuing day-to-day basis the physical, emotional, moral and educational needs of the child." (Citations omitted; internal quotations omitted.) In re Kezia M., 33 Conn. App. 12, 21, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).
The court must also consider, under the second prong of the no-ongoing statute, "whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship." Upon being notified that his parental rights were in jeopardy, Mr. R. returned to Connecticut and has consistently since then sought visitation and contact with his child. He has paid child support, consistently sent gifts and cards to the child, and repeatedly expressed his desire to see his son. On December 20, 1999, Dr. Eneida Silva, Ph.D., conducted a court-ordered evaluation of the interaction between Mr. R. and Jose. Dr. Silva then recommended that DCF provide visitation between Mr. R. and Jose in order to explore the possibility of developing a closer relationship between the two.
As a result of that recommendation, Mr. R. moved for court-ordered CT Page 2329 visitation. Although DCF initially objected to his motion, it then decided to provide supervised visitation. At a hearing requested by the AMC on visitation while the TPR petition was pending, Dr. Silva testified that, based on her observation of the December 20 interaction between father and son, she believed that Mr. R. was committed to having a relationship with Jose, was appropriate in his affect and behavior with the child, and ought to have an opportunity to develop a closer relationship with his son. She testified that she thus recommended that such efforts be made.
At the visitation hearing and trial, the child's therapist, Ada Rodriguez testified that when Jose is under stress he reacts with aggression toward others, agitation and disorganization. She testified that visits with Mr. R. could be confusing to Jose and that such confusion could lead to aggressive acting out behavior in the foster home that would jeopardize his placement there. Changes in schedule cause Jose great stress that causes his behavior to deteriorate. Jose's best interest requires a consistent predictable environment that provides him with structure and stability. He currently is placed in a pre-adoptive foster home that meets his needs. He is closely bonded with his foster father, whom he regards as his father. Under these circumstances, the court concludes that it would be adverse to Jose's best interest to allow further time for a parent-child relationship to develop between him and the respondent. Mr. R.'s willingness to assume a parental role in his son's life simply came too late. The court finds by clear and convincing evidence that to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
 IV — DISPOSITION
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase.[8] In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R.,51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a non-consensual case, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes § 17a-112 (k). In re Tabitha P., 39 Conn. App. 353,664 A.2d 1168 (1995).
A. Required Statutory Findings
The court makes the following written findings, as required by General CT Page 2330 Statutes § 17a-112 (k). The court has considered these factors and its findings in determining whether it is the best interest of the child to terminate the parental rights of each respondent. In re Quanitra M.,60 Conn. App. 96, 758 A.2d 863, cert. denied 255 Conn. 903, 762 A.2d 909
(2000).
 (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k)(1)
As noted above, DCF offered timely and appropriate services to the respondent mother to help her address her mental health issues and live on her own. These included referrals for mental health treatment and independent living services. DCF offered no services to the father in the pre-adjudicatory phase of the case as DCF did not know his whereabouts and he made no effort to contact DCF until filing of the petition. After Mr. R. returned to Connecticut, in the period after DCF had filed the TPR petition, DCF offered him appropriate services in a timely manner to assess whether he had a substance abuse problem and to help him address the anger and domestic violence that had characterized his earlier conduct toward Arelis. As described more fully below, DCF also agreed to allow him to visit with his child until a court order precluded such visitation during the pendency of this proceeding.
 (2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended — § 17a-112 (k)(2)
The efforts DCF made to reunite the respondent mother with her child were reasonable. No such services were offered to the respondent father in the pre-adjudicatory phase of the case as he was then unwilling and unable to benefit from them.[9] After DCF filed the TPR petition, Mr. R. twice moved for visitation with the child. The court, McMahon, J.,
denied the first motion on March 14, 2000. After Mr. R. filed the second motion on June 10, 2000, DCF initially objected but then, upon Dr. Silva's recommendation, agreed to provide supervised visitation. Counsel for the minor child asked the court to prohibit visitation while the TPR trial was pending and requested a hearing on the matter. After that hearing, held on November 3, 2000, this court found that such visits would not be in the child's best interest during pendency of the TPR proceeding and prohibited visitation until a decision on the petition. Under these circumstances, the court finds that DCF made reasonable efforts to reunite Mr. R. and Jose after the respondent father's return to Connecticut. CT Page 2331
 (3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112 (k)(3)
On February 11, 1998, after the OTC the court entered an order of specific steps for Arelis to do the following:
• Keep all appointments set by or with DCF. Arelis kept appointments set by DCF with service providers. She missed many appointments to visit her child.
• Cooperate with DCF home visits, announced or unannounced. Visitthe child as often as DCF permits. Arelis kept her whereabouts to DCF known and cooperated with home visits. She missed many visits with the child.
• Participate in parenting, family and individual counseling. Arelis completed parenting counseling classes at the Hispanic Health Council to which DCF referred her. She had weekly therapy scheduled with Dr. Kribeck of the Charter Oak Clinic but missed many appointments in the period between the OTC and filing of the TPR petition. While in the IOL Adult treatment program between August 1999 and January 2000 she also missed appointments with her clinician. After her discharge from that program, she continued in outpatient therapy but the evidence did not disclose whether she missed any appointments.
• Sign releases authorizing DCF to communicate with serviceproviders to monitor attendance, cooperation and progress. Arelis complied with this order.
• No substance abuse; no involvement /further involvement with thecriminal justice system. There was no evidence that Arelis used illegal substances. She was not arrested.
On June 4, 1998, the court ordered expectations that were identical to the February steps but eliminated the order for family counseling and added a requirement that she secure and maintain adequate housing and income. After living with her mother in housing unsuitable for her child, in late 2000 Arelis moved into her own apartment. She has since complied with the order for adequate housing and income.
Since Mr. R. did not appear in the OTC or neglect proceedings, there were no court-mandated expectations, specific steps, or other orders specifically directed at him until the commencement of this proceeding. CT Page 2332 After the November 2000 hearing on visitation described above, DCF complied with this court's order prohibiting Mr. R. from visiting with Jose while the TPR proceeding remains pending.
 (4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties — § 17a-112 (k)(4)
The child Jose is closely bonded to his foster father, whom he regards as his psychological parent. He knows that the respondent Arelis E. is his mother, and he has a connection to and affection for her. He looks forward to visits with her. He has no emotional ties with, and only negative feelings for, Mr. R.
(5) The age of the child — § 17a-112 (k)(5)
At the time of the issuance of this decision Jose is 5 years and 10 months old.
 (6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child — § 17a-112 (k)(6)
The respondent mother sought and received mental health counseling and psychotropic medication to help her cope with her bipolar disease. She moved out of her mother's home and now shares an apartment with her boyfriend. She has not maintained consistent contact with her minor son, and missed many visitations with him in the spring and summer of this year. She has continued to show behavioral signs of not being ready or willing to accept responsibility to care for this child. These include the many missed visitations and court sessions and frequently expressing a desire to relinquish her parental rights. Overall, the court finds that her efforts to adjust her circumstances, conduct, or conditions have not reached a sufficient level of personal rehabilitation for it to be in the best interest of the child to return to her care or home.
Before filing of the TPR the respondent father did nothing that would CT Page 2333 make it in the child's best interest to be placed with him. Since then, Mr. R. has done almost everything he reasonably could have to assume parental responsibility: he has participated in DCF referrals for domestic violence counseling and substance abuse evaluation and treatment; held a regular job and paid child support; sent DCF cards, gifts and letters to and for his son; and consistently expressed a desire for visitation with his son. Unfortunately, his efforts have come too late for it to be in Jose's best interest to be reunited with him. The child's own needs for consistency, structure, stability, and predictability all lead the court to find by clear and convincing evidence that his best interest is to remain where he is, rather than having his life turned topsy-turvy by removal from the foster parent around whom his world revolves and who meets his many needs.
 (7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent — § 17a-112 (k)(7)
No unreasonable act of any other person or economic circumstance of either parent has played any part in preventing either respondent from maintaining a meaningful relationship with the minor child.
B. Best Interest of the Child — § 17a-112 (j)(2)
The final element of the termination of parental rights statute, §17a-112 (j), requires that the court find, "by clear and convincing evidence . . . (2) that termination is in the best interest of the child. . . ." In determining whether terminating the respondents' parental rights would be in the best interest of the minor child here, the court has considered various factors, including Jose's interest "in sustained growth, development, well-being, and in the continuity and stability of [his] environment;" Capetta v. Capetta, 196 Conn. 10, 16,490 A.2d 996 (1985); his specific needs; the length and nature of his stay in foster care; the nature of his relationship with his biological and foster parents; the degree of contact maintained with the biological parents and the potential benefit or detriment of his retaining a connection with his biological parents; his genetic bond to each parent,In re Savanna M., 55 Conn. App. 807, 816, 740 A.2d 484 (1999); and the seven statutory factors. The best interest standard is inherently flexible and fact-specific to each child, giving the court broad discretion to consider all the different and individualized factors that might affect a specific child's welfare.
As noted several paragraphs above, both respondent parents have, in the CT Page 2334 time since filing of the TPR petition, taken various steps that significantly addressed reasons the child was not in their care. The respondent mother, after numerous psychiatric hospitalizations and an unsuccessful stay at Barnard House, has had no psychiatric inpatient stay since August 2000. In view of the frequent and repeated hospitalizations before then, the court can reasonably infer, and does, that the combination of outpatient therapy, psychotropic medication, moving out of her mother's home, and personal maturation have all contributed to improved mental health status for her. Yet her behavior still does not show an ability or readiness to assume care for Jose or to meet his needs. Jose's best interest now is to stay with his foster father, who provides the stable, structured, and predictable home environment this child needs.
The guardian ad litem testified that Jose has a connection with his mother and looks forward to seeing her, and that not having any further contact with mom would be detrimental to Jose. Yet she did not advocate removing Jose from the foster father's household, and counsel for the minor child argued in summation that despite this bond between mother and child it is in Jose's best interest to terminate his mother's parental rights. Jose is a young child with many special needs. He needs permanency, structure, stability, and consistency — none of which his mother can offer him. Changes in routine cause him stress and exacerbate his behavioral problems. Taking into consideration the totality of the evidence with regard to Jose's needs, the court finds by clear and convincing evidence that it is in his best interest to terminate his mother's parental rights. The foster father has consistently shown a sensitivity to Jose's affection for and connection with his mother. Nothing in the court's decision today precludes Mr. V., should he adopt this child, from allowing further contact between Jose and his mother to the extent that, as the child's adoptive parent, he finds such contact would be appropriate.
As for the respondent father, his belated efforts to assume responsibility for the child all came too late in Jose's life to serve this child's best interest. Mr. R.'s opportunity to be Jose's father was in the period before and after the OTC. Since the few months when mother and infant lived with him in Puerto Rico during late 1996 and early 1997, he has not been a parent to this child. He knew that Arelis had mental problems because when she lived with him in Puerto Rico she had to be psychiatrically hospitalized. Yet when the maternal grandmother and mother returned with Jose to the United States, he remained in Puerto Rico. Mr. R.'s subsequent contacts with the maternal grandmother cannot substitute for actually taking care of Jose. When neither maternal grandmother nor mother could provide adequate care for Jose, and the child went into state custody, Mr. R. stood on the sidelines. As a result CT Page 2335 of permanency planning at DCF, Jose was placed in an excellent foster home where he has come to thrive. Despite the child's psychiatric diagnoses of PTSD and ADHD, and problems in daycare and school, the foster father, aided by a caring mental health clinician, has helped Jose to modify his outbursts of behavior at school, and today the child is doing much better. To remove Jose from the setting in which he is now placed, which meets his needs, and from the person he knows as his parent and caretaker, would be detrimental to this child. Based on all the evidence before the court, the court finds by clear and convincing evidence that it is the best interest of this child to terminate Mr. R.'s parental rights.
 V-ORDERS
Having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist to terminate the parental rights of Arelis E. and Juan R. to their minor child Jose, and having determined, upon all of the facts and circumstances presented, that it is in Jose's best interest to terminate the parental rights of his biological parents, the court accordingly ORDERS:
The court hereby TERMINATES the parental rights of Arelis E. and Juan R. to their minor child Jose.
The court appoints the Commissioner of the Department of Children and Families as Jose's statutory parent for the purpose of securing an adoptive family or other permanent placement for him. In view of the length of time that Jose has been placed with the present foster parent, his bonding with his foster father, and the foster father's stated willingness to adopt Jose, the court directs the Commissioner to give first preference to the current foster father for adopting Jose.
Within thirty days of this judgment, the Commissioner shall submit a written report addressing such permanency plan; DCF shall file such further reports as are required by state and federal law.
BY THE COURT
 ___________________ STEPHEN F. FRAZZINI Judge of the Superior Court